May I begin? Yes. Good morning. May it please the court. Judge Jones, Chief Judge Owen, and Judge Wilson, my name is Raleigh Apollacronis and I represent Appellant Jerry VanWagner, an inmate in the Mississippi State Penitentiary at Parchman. He has been suffering from Hepatitis C for about nine years and we ask today that you reverse the decision of the District Court granting Apolli's summary judgment motion on his Eighth Amendment deliberate indifference claim and reversing and appointing him counsel for further proceedings. This is a disease he contracted at a prison barbershop while incarcerated. Mr. VanWagner's chronic Hep C has advanced to the point where there is liver scarring in his liver and despite the advancement of his disease under the watch of Apolli's, he has never received life-saving direct-acting antivirals, DAAs I'll refer to them as, which are the standard of care thanks to the medicine over the last decade. But I'm not here, this is not a case about policy. This is not a case about what policy and how Hepatitis C should be treated in the Mississippi prison system. I'm not asking the court to order MDOC to treat him with direct-acting antivirals today and we're not asking the court to even opine on the constitutionality of MDOC's Hepatitis C policy to the extent there is one because there's a debate there, they have not produced it. We're just not there yet in the proceedings. I am here today to ask you to allow Mr. VanWagner's case to go to trial. I'm here today to ask you to reverse the District Court's ruling because it is based on a record devoid of competent evidence to support its decision and there are numerous disputed issues of I appreciate the care with which you're stating your position but a problem I have, well I have two problems with what you're saying and one is that Mr. VanWagner, I thought, pled this as an Eighth Amendment deliberate indifference claim and you're confined to that for whatever, you know, for whatever the consequences are. But the second one is I do not think this record is devoid of but I did read all of the medical records from the most recent visit that we have in the record which is January of 2019 and those were offered into evidence by one of the defendants. They weren't objected to so to me they're in the record. Yes, Judge Jones, let me address both of those points. Okay. So the first is yes, this is a deliberate indifference claim but there are still factual issues to be determined on that claim. As we know, a prison official violates the Eighth Amendment when he or she is deliberately indifferent to serious medical conditions and a plaintiff can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly have been to wanton disregard. But isn't that a disagreement between two physicians essentially? Why is it not, on this record, why is that not the case? So even if that is the case, even if there is a disagreement between two physicians, and I want to address Judge Jones's record as well, that is a factual question and the record here is that Mr. Van Wagner had advanced liver scarring. But counsel, it's not a material factual question, right? Because under the law, isn't it that a dispute between two doctors or disagreement about the course of care doesn't rise to the level of deliberate indifference under the Eighth Amendment? How is it material? So it is material. I disagree with that statement of the law. Let me get to that. It is material because the fact, the level of advancement, let me just step back one second to get to the District Court's decision. The District Court said that there was no liver damage and based the decision that there was therefore no deliberate, could not be deliberate indifference on that fact that there was no liver damage. The record belies that. That is not true or at the very least there's a disputed issue. In the record on appeal at 1174, 796 and C81. We don't disagree with that. He was wrong. He misstated that conclusion. And the liver enzymes as well, which then says if the liver enzymes is another matter as of January 19, the Dr. Castillo said that one of them was totally normal and the other one was only slightly elevated. Again, ALT and AST. Yes, Judge Jones and that is a snapshot in time. Correct. If you go back and look, those liver enzymes shot up at least eight different occasions and the ALT is the one that you should be looking at. You know that we should look at the fact that they shot up on many occasions. I mean, we're not doctors. I've been in the hospital. I've had a liver doctor, you know, I've had the physician's assistants come to me and say, well your enzymes say this and your enzymes say that. Well, we need to really look at this. And seriously, I'm not a doctor. It was mush. Well, so one thing there, it's actually not in dispute that elevated liver enzymes, both the ALT and AST, may indicate liver disease. Apolli Brown actually states that in the brief at page six, note two. So the fact of elevated liver enzymes in and of itself show advancement of the liver disease. But they don't show, I don't think, counsel, deliberate indifference to his medical needs. Again, this kind of boils down to how medical professionals would interpret what course of treatment was necessary. And he was getting treatment. I mean, just by the fact that we've got reams of medical records where this was being monitored, this was being tested, and all that sort of thing. It's just, I'm failing to see how this adds up to deliberate indifference or a material issue of fact as far as that. Okay. Well, I would disagree with you that this was treatment. This was monitoring. This was checking enzyme levels. Checking his... But I mean, when I go for an annual physical each year, I mean, they're monitoring. They take my blood. They do various things that they do and run various tests. Is that not treatment? Treatment, no. It is not treatment. And so if we look at some of the Fifth Circuit cases, the lauders... Again, two physicians disagree on what treatment is necessary. Do you have record evidence that no reasonable physician would do what the physician did in this case? So there is a record evidence from which a jury could infer that a doctor's no, you don't. Do you have record evidence that when the doctor said, no, you don't, no reasonable medical physician would have made that call? That's a little bit of a difficult question to answer. I'm not trying to be evasive. Because what I'd like to set out is what does exist in the record. Okay. But just a dispute will not get you to medical, will not get you to deliberate indifference. And that's what I'm, what we're trying to get at here. Yeah. And I think part of the problem here is we're not asking for a rule of law on what deliberate indifference is. What we're asking here is for the issue to go to a jury to determine whether... You don't have a jury issue if there's simply a disagreement among experts. That is not, that does not raise a fact issue of deliberate indifference. But not under the lauder and Easter and Lawson. In each of those cases, there's not, they're not hep C cases. But in each of those cases, the inmate was provided some monitoring. And in some instances, some treatment. And this court, the Fifth Circuit said, that has got to go to a jury. Because it's not clear whether it was deliberate indifference or not. We've got to assess what kinds of monitoring or treatment was provided. We've got to assess whether cost was the only factor. It certainly is a factor to be considered. But whether it was the only factor. And we've got to consider whether a doctor's orders to treat, a doctor's orders here from Mr. Van Wenger to go to a gastroenterologist were not followed. And they were not in this record. And so under the lauder, under Easter, and under Lawson, that creates a factual issue for a jury to infer that the physicians, Nurse Brown, and the physicians were deliberately indifferent to a serious medical need. Well, with regard to Nurse Brown, I think the record indicates that, if I remember right, she recommended a referral to a specialist or something like that, right? So what's your claim against Nurse Brown, who I think didn't have the power to effectuate that referral or make sure it happened or make the decision? What did she do that was deliberately indifferent, where there's a fact issue with regard to Brown? So Nurse Brown saw Mr. Van Wenger on numerous occasions over several years and failed to prescribe the direct acting antivirals. Her declaration in this case says that there is an MDOC policy, which again is not in the record. Police have not produced it. And so we don't know at the end of the day what the full... But she said she couldn't prescribe them on her own. Well, it's a little bit more nuanced, I think, than that. What it says is that the policy that we do not know entirely about provides for an automatic referral when the FIB-4 score approaches or exceeds 2.5. And she says, and that is correct, that the FIB-4 score, there are other tests, did not approach or exceed 2.5. We don't know what other methods were available to her. That is but one way to test here that he had cirrhosis, that he has severe fibrosis, that he has an F3 on it from a 0 to 4 of a fibrosis scale. So what she failed to do that rises to deliberate indifference was she failed to prescribe these DAAs. Failed to prescribe it, failed to follow up on the referral, to make the appointment, to ensure that he goes to the gastroenterologist. It's nearly three years since that exam, and normally we don't go out of the way, it would be a shame to reverse and remand for trial if, in fact, the fellow is getting treatment now. Do you have any idea? He's not. Okay. As far as I'm aware, he's not. Okay. And treatment here, at the very least, should be something that a jury would consider. Do you want a jury to decide whether you should have antiviral treatments? The jury should decide if the MDOC and Nurse Brown and Dr. Perry have been deliberately indifferent, if it's been grossly negligent. Under the facts of this case, the thing I want to point out a couple of things. I mean, you know, part of the business, this is a chronic disease. It's like certain, you know, maybe to a layman, like certain forms of arthritis that you can ameliorate the symptoms, but maybe it will never get better. And it seems to me the part of showing deliberate indifference is that you're suffering greatly right now, or it's inevitable that you're going to suffer greatly at a, you know, a time that's not remote if you don't get treatment. Is there any evidence that he's suffering greatly right now? Yes, there is. He has submitted declarations, affidavits. There are numerous, numerous requests for treatment because of abdominal pain, stomach pain, fatigue, numerous. He also has pretty bad gastroreflex disease. He does have GERD. That is correct. One of his ultrasounds was for that in August of 2019. That is correct. And so in this particular case, though, what we really have to remember here is that he has progressed. He has either severe fibrosis or cirrhosis. And if you look at the amicus brief, which tells us that the standard of care in those instances, in this highly progressed portion of hepatitis C, is to give DAAs. This is a revolutionary treatment over the last ten years that has actually worked to cure this illness. But, counsel, you talk about the standard of care. Yes. And note the amicus brief. But the standard of care is really not our relevant inquiry because even negligent treatment doesn't rise to the level of deliberate indifference. Right. Does it? That's correct. It's grossly negligent. Earlier you said I had misstated the law or that I had an incorrect statement. No, I want you to explain to me what it is. I mean, what it is I got wrong. I want to think about it the right way. So I think it's two things. I think what I was telling you before about the three cases, Easter, De Lauder, and Lawson, those show that the inquiry is when you have a serious illness, like this one, when you have evidence of degradation in the liver, like this one, when you have questions as to whether cost was the only reason that the treatment was not provided, when you have doctor's orders that were not followed, all of those things can rise to the level of showing gross negligence. But let me ask you just one follow-up, if I might. What is your best case where the evidence goes both ways? I mean, we have this, we have these one series of tests that show that actual referral wasn't required or wasn't, he was sort of still in the monitoring category. So what's your best case where the evidence is split on that? Well, let me, I would direct you probably, because it's important, I think, to look at the hepatitis C context. I would probably look at Atkins and Hoffer, which are not in this circuit. These are 7th Circuit and, I'm sorry, I think 8th Circuit and, 6th Circuit, apologies, and 11th Circuit cases, where there was a full-blown hearing. There was 5 days in both of those cases of evidence that was given to the court, and in those, under both of those policies that were ultimately deemed to be constitutional in those cases, not all inmates are treated, going to your point, that this isn't just negligence. It's got to be above that. But Mr. Van Wagner would be given the DAAs under both of those policies that were ultimately upheld. And no, they're not policies that give to every inmate. That's not the question. But we're not talking about policies, I thought. We're talking about Mr. Van Wagner, admittedly a serious disease, but the medical evidence seems to kind of go both ways. And so if one strand of medical evidence suggests monitoring, and another may suggest more aggressive treatment, where's the deliberate indifference in deciding one course versus the other? And I think that is a question of weight. When you have one, just the fibro test score, the .86 that a police cite to, and you have got several other indications of advanced fibrosis, I would say that that is the fact question that goes to a jury to say, you have now reached the point where we're into gross negligence. But a jury cannot decide that without medical expert testimony. Where is that in the record? There is no expert testimony right now. Mr. Van Wagner did not have counsel below. Did his best on his own. I have just a few seconds. I'll address more on rebuttal. But this is a case where we would argue that appointment of counsel would greatly help elucidate the questions and explain the expert testimony that would be necessary. Counsel would be able to draw that out, even if experts were not able to join for a trial, at the very least through cost examination of the doctors who are a part of this case. My time is up. Good morning, your honors. May it please the court. My name is Chad Williams from the Mississippi Attorney General's Office. I represent Dr. Gloria Perry, the former chief medical officer with the Mississippi Department of Corrections. There's no Fifth Circuit precedent for finding that Van Wagner's disagreement with his medical care rises to the level of a constitutional violation. There's no authority for substituting Van Wagner's preferred standard of care for the deliberate indifference standard. And the record is clear that Van Wagner never approached the threshold fibrosis four score of 2.5, which would have resulted in a referral for further treatment of hepatitis C. For these reasons, the court should affirm the district court's grant of summary judgment in this case. Counsel, how do we get to kind of ask you the flip side of what I asked counsel opposite? How is this not a material issue of fact, given that there's medical evidence on both sides and all of that? Your honor, the record is clear that Mr. Van Wagner is demanding a different course of treatment than what his medical providers have provided him. This court's been very clear that does not constitute deliberate indifference. Can you point to anything on Dr. Perry's behalf that anything other than cost was the driver in denying this care? Well, the MDOC policy that has the 2.5 fibrosis four threshold, he never reached that. He never reached that level, so there was no need for him to go on for additional treatment. But was that the basis of Dr. Perry's decision, or where is that in the record? Well, there's nothing about Dr. Perry making any decisions. I believe they were upset that Dr. Perry had a delay in getting him maybe to the GI doctor, which Mr. Van Wagner admitted he went to, but again, he disagrees with what the GI doctor did. He says, no, he wasn't looking at my hepatitis C. He was looking at something else. So the court can't allow inmates to come in with their understanding or misunderstanding of what a medical procedure is and disagree with it. Otherwise, this court will become a medical review board for inmates' opinions on their medical care. How long is Van Wagner's sentence? I believe he has significant time left, Your Honor. I think maybe in the early 2030s. I believe he has significant time left. There's no issue regarding. I know in some cases and in some circuits it's popped up. I believe the plaintiff cited one, the Mitchell case. This poor gentleman was caught in kind of a perpetual loop of they didn't want to give the man DAAs because he was going to get out soon. He would come up for parole, and he either would reject. He would say, I don't want to be paroled, or he wouldn't get parole, and he would go back in the system, and it was a perpetual loop, and we don't have that here. I would like to address, in addition to the cost issue that has come up. So you're saying that as to the cost issue, this record doesn't even get there because Dr. Perry did nothing except. Did Dr. Perry have the authority, or was she asked to approve him to go to the gastroenterologist in January of 19? She was asked and approved, and he went, Your Honor. In January of 19? It was later that year. It was April or August. Oh, I had the impression that had been denied, but I guess I was wrong. No. Okay. So that's as much as, that's her only connection with this case? Yes, Your Honor. Did she promulgate a policy? There's no record evidence regarding how the policy was promulgated, Your Honor. The department, one person would not have promulgated the policy, though she would have been involved in it, but it would have been a. . . You said there was a 2.5 threshold on the FIB 4 score. Yes, Your Honor. I mean, I saw something about that in the record, but is that the entire policy, or is there more? Yes, Your Honor. Well, that's part of the protocol for deciding, for prioritizing inmate care for inmates that have hepatitis C. Go ahead, Your Honor. I apologize. No, go ahead. It helps to understand, too, where this disagreement regarding medical care comes from. There are not absolutes in this treatment. The treatment he is receiving is noninvasive, looking inside his liver, right? The invasive approach would be a liver biopsy. We're all familiar with those. So the fibrosis 4 score uses these different parts of the blood work. For example, to get a fibrosis 4 score, you take someone's age and multiply it by their AST level, which you've seen in the records. You divide that by their platelet count, multiply it by the square root of the ALT level. All right? An APRI score, which other departments' correction may use, is the AST level divided by the ALT level. I'm sorry. AST level divided by the AST upper limit. Well, now we're talking about is the policy reasonable or not. And it seems to me the question is, did Dr. Perry make an independent medical judgment that the policy is an adequate standard of care and then apply that policy to Mr. Van Wagner? Or did she just follow the policy and did, I guess, bottom line, did she make an independent medical judgment that he was getting adequate medical care? She never made any judgment, Your Honor, because he never got to the threshold that would require additional outside treatment. You say that based on the policy. Why didn't she make that determination herself? Because Mr. Van Wagner never hit the threshold which would require any further determination. Whose threshold? The Mississippi Department of Corrections. And has she said that that policy is a reasonable medical standard? No, she's not putting evidence in the record that that was reasonable, but there's no evidence that it's unreasonable either. And the only thing that is there is that it's a disagreement between medical providers about which one of these is just. Well, no, there's disagreement between some medical providers for Van Wagner and the policy. Where is there evidence that what Perry did was reasonable? Well, Mr. Van Wagner admitted he went to the gastroenterologist. The gastroenterologist had authority to look at his reflux disease and he had authority to look at the liver, didn't he? I mean, the Mississippi Department couldn't tell him not to look at the liver. That's right, Your Honor, and to Judge Wilson. But is that in the record? I mean, is the gastroenterologist from April or July of 2019 in the record? No, because the treatment is ongoing, Your Honor. Oh. He's still being treated today. Well, I know that, but what I'm saying is the last medical record I saw was Dr. Castillo in January of 2019. Yes, Your Honor, but I believe that Mr. Van Wagner may be in footnote, well, not footnote 15. Mr. Van Wagner indicates that he, in the record, that he saw the gastroenterologist. His opinion is that he didn't look at his hepatitis C, but as Judge Wilson pointed out, when you go for a checkup, they look at all kinds of stuff and this may not necessarily be limited to what you're there for. But, counsel, you do have the situation where his treaters, Nurse Brown, I guess, among them, clearly recommended that he be seen by a specialist at points in time during his treatment. So how's that handled? I mean, in other words, if you say Dr. Perry never got to the threshold of making a determination, is that just driven by this policy or is it driven by a medical judgment, per Judge Owen's question? Well, it's got to be medical judgment, Your Honor, because he had… Well, it's got to be, but where's that in the record? In addition to the blood work calculations they're doing, he's getting these imaging of his liver. He's getting x-rays. But Nurse Brown said that all that treatment, monitoring, whatever it may be, indicated the need to go see a specialist, correct? No, no, the specialist he went to, the need for additional… The gastroenterologist. Or the sonogram. It's just another way to look at the liver and see what kind of scarring may be present. A non-invasive way of doing that, and he's received that treatment. He received the x-ray. He received the endoscopy from the… But to Judge Jones' point, I mean, I guess I'm just confused. Admittedly, because I'm not a doctor, I thought that was for a different set of symptoms, a different treatment than his liver. No, Your Honor. Okay. All right. Well, he had two problems that could be addressed by a gastroenterologist. One of them is reflux disease, and the other one is liver. And when he went to the gastroenterologist, the doctor could look at both as a specialist. And you're saying that Dr. Perry approved that? Yes, Your Honor. I mean, that's why that happened. That's how he… It would have had to have been approved for him to have gone and had these things done. Was that in response to Nurse Brown's recommendation? Yes. A request was made and satisfied. Well, that's helpful to clear it up in my mind anyway. All right. And as far as the cases cited by Mr. Van Wagner and specifically counsel today, about there being examples of where inmates would have a disagreement that does rise to the level of deliberate indifference, those are easily distinguishable. In Easter, you had an inmate that had known heart attack problems, and a nurse simply refused to give him his nitroglycerin tablets, sent him to a closed pharmacy to get them. Ultimately, four hours later, another nurse simply gave them to him and relieved the pain. In Lawson, medical providers failed to follow up on some illegible notes about a doctor turning a paraplegic, and he developed acubitus ulcers. In De Lauder, which involved Mississippi Department of Corrections, significant difference in the record there and here is that there was a letter from an orthopedic surgeon that implied that cost was the reason Mr. De Lauder had not received surgery. We have nothing of that nature in this case. But with those cases, they all revolve around obvious problems where common and easy solutions were at hand and were ignored. They did not deal with a chronic, long-term situation like we have here. In Department of Corrections, Dr. Perry would ask you to affirm the district court. Thank you. Good morning, Your Honors, and may it please the court, I'm Michael Bentley on behalf of Nurse Practitioner Angela Brown, who is one of the medical staff that provided treatment to Mr. Van Wagner. I want to start, if I can, with the questions about the specialty consult and see if I can help clear up the record about that. The record is clear that both Nurse Practitioner Brown and Dr. Del Castillo, another provider at the prison, evaluated, ran tests on Mr. Van Wagner, and both proposed specialty consults. Despite the fact that his FIB-4 score was below the agency's threshold for a referral, they exercised their medical judgment to suggest that, because he wanted one and because in their judgment he was at least a candidate, that he should receive one. Mr. Van Wagner's declaration, which is in the record at 765 through 68, confirms that he, in fact, did get a specialty consult. He went out to a GI. Now, Mr. Van Wagner says, the GI only looked at my reflux. He didn't look at my hepatitis C. But to Judge Jones's point, it's logical that if Mr. Van Wagner shows up at a GI and says, look, I'm about to die from hepatitis C, would you take a look at that? Then, of course, the gastroenterologist would do that. And there's nothing in the record, other than Mr. Van Wagner's lay testimony, suggesting that the GI did not look at it. Do we have the GI's records to show? We do not. Those are posts where the records, in this case, cut off. But we have Mr. Van Wagner's testimony that he saw a GI and that, in his view, the GI did not look at his hepatitis C. We don't have any medical testimony that that's the case. To Judge Wilson's question about what other than costs supports or would inform the decision by the department, I think it's pretty clear in the record, and if you look at cases like Hoffer from the 11th Circuit and Atkins from the 6th Circuit, that corrections agencies with finite resources, like the Mississippi Department of Corrections, have to make decisions about how to prioritize the treatment of a large group of inmates that suffer from chronic hep C. And the way they do that is they monitor and evaluate patients. They select a criteria. In this case, the Department of Corrections has selected the FIB-4 score of 2.5, where if you reach that benchmark, you're then eligible for a specialty consult and further evaluation and potentially DAA treatment. But all corrections agencies, if you look at the cases and if you think about it, have to prioritize how they treat inmates. Mr. Van Wagner fits within that prioritization system, and his complaint is that within that system, he's not being treated as fast as he would like to be treated. Well, is there evidence that it is not the standard of care to give the DAAs whenever there's hepatitis C? If that's the standard of care, hadn't that been violated, regardless of the policy? Well, the standard of, again, there's no medical testimony in this record about what the standard of care is or whether the policy that the agency pursues violated the standard of care, and certainly no evidence that Nurse Practitioner Brown, in some way, was deliberately indifferent. But to Your Honor's question, the standard of care, and you can read Hoffer and Atkins in the community, is, yes, resources aside, a person who showed up in a physician's clinic in the free world and had hepatitis C, the physician would say, the standard of care today is direct-acting antivirals, and I will prescribe that for you, and if your insurance will cover it, or if you have the means to purchase it, then you can be treated that way. That is entirely separate from the question of deliberate indifference, as all of Your Honors were discussing with my colleagues. The question of deliberate indifference absolutely involves cost considerations. Hoffer, Atkins say that. This Court's case is... Well, that can't be the case. I mean, if you have a heart condition that in the free world, as you put it, every physician would treat, you can't say, well, the prison doesn't have to treat it because it's too costly. That's absolutely right, Your Honor, and Easter is a good example of that where you have an acute condition, a heart situation where an inmate could suffer a heart attack or other potential consequences immediately. Then, of course, Hoffer recognizes this, Atkins recognizes this. You don't say cost, well, we can't afford to send you to a cardiologist, so we're not going to do it. But what they say is that when you have inmates that are on a slow-progressing disease or infection like hepatitis C is, there's no debate about that. It progresses differently in every patient. It progresses very slowly in some. When you have a population that has a chronic disease, you have limited resources to treat that population, then what you do and what the corrections agencies do is monitor the population so that they can identify the inmates who are approaching acute or problematic progression. Well, counsel, so specific to Nurse Brown. Yes. You heard what counsel Opposite said regarding, I mean, I was trying to get at what Nurse Brown did that would rise to deliberate indifference or create the fact issue, and what I distilled from that conversation was that So talk a little bit about that and explain why we don't have a fact issue here that precludes summary judgment. Yes, Your Honor. As for Nurse Practitioner Brown, her declaration indicates that the protocol, she does not have the ability or even the expertise to prescribe DAAs. What she does is monitor and evaluate the patient, Mr. Van Wagner and many others, and you can see in the record, and I would cite record 1143 through 54, that Mr. Van Wagner was enrolled in the chronic care clinic and was seen approximately every four months, either by Nurse Practitioner Brown or another medical provider to make sure that his condition was not progressing to a stage where he needed a referral. And then you can look at the records at 255 through 362. These are the comprehensive medical records that show numerous contacts by Nurse Practitioner Brown and others with Mr. Van Wagner in which they're observing him, running labs, analyzing labs, making determinations about whether his FYB4 score, his fibrosis staging, all of that. Is she still in charge of his care? Yes, and to step outside of the record, and Your Honor asked my colleague about treatment today, yes, she's still in charge of his care, and this is not in the record, but he is, of course, still being evaluated. His liver levels are normal. He has not been prescribed DAAs. His FYB4 score is still below two and a half. All of that is outside of the record, but that is the fact, and she is still continuing to treat him today along with numerous other providers, including Dr. Del Castillo. But, Judge Wilson, the last thing that I would point to is Nurse Practitioner Brown again, despite the fact that under the protocol he was well below the FYB4 score that would have triggered an automatic referral, she made a referral to an outside specialist. There's nothing in these records that suggests that Nurse Practitioner Brown was wantonly disregarding or intentionally mistreating Van Wagner. The records are just the opposite. She was continuously monitoring, continuously evaluating, and making recommendations to see a specialist when in her medical judgment the condition warranted it. She did not have the ability to prescribe DAAs, but she certainly didn't thwart or interfere with any other medical person's decision to prescribe, if there was such a decision, to prescribe those. So, you can't look at this record of continuous care by Nurse Practitioner Brown and see that there's some factual dispute on which a jury could find that she was deliberately indifferent to Mr. Van Wagner's chronic hep C.  She treated him under the policy. She made a referral to a specialist. Do you think we'd be here if the district court hadn't misspoken and said there was no liver damage? Probably not, Your Honor, and I think if you look at the records, though, the medical records, despite that characterization by the district judge, the records show that Mr. Van Wagner's condition is well controlled. There may be liver damage, but there's a serious question about, there's a debate about whether he has serious disease. I mean, whether it's debilitating to his body or something. That's correct, and whether his case should be prioritized over how many other inmates there are in the system that are also awaiting DAA treatment. Again, we're without any medical evidence to suggest that Nurse Practitioner Brown failed to follow standards of care, much less to suggest that she was deliberately indifferent to his condition. And the last thing I would say is there's no evidence at all in this record that Nurse Practitioner Brown's decisions were driven by cost. Just the opposite. She made specialty referrals. Even Mr. Van Wagner's own declaration doesn't say that Nurse Brown was acting on cost concerns. So on this record, there's no basis for finding Nurse Practitioner Brown to have been deliberately indifferent. Thank you, Your Honors. Thank you. Thank you. There are a couple of points I'd like to respond to. The first thing I'd like to do is clear up the error in the record. There were questions at the beginning of Council's presentation about the August, not July, August 2019 ultrasound and a gastroenterologist referral. I apologize. As far as we know in the record, when we were talking about record evidence, not what Council just says here today, record evidence is that that appointment had nothing to do with Mr. Van Wagner's hepatitis C. But that's all from Mr. Van Wagner's declaration, right? That is true. And there's nothing else, though. And on a motion for summary judgment, the non-movement gets the benefit of all inferences. There is nothing else in the record indicating. And actually, I will tell you, there's one other thing in the record. And again, it tends toward Mr. Van Wagner's position. And that is that it was a prescription for omeprazole, 20 milligrams. This is at ROA 616, which is treatment for acid reflux. The referral that day had to do with his esophagus. There was not an examination, as far as the record shows, of liver function. So to say that Council can say now, oh, well, you know, he could have looked into that, that's not in the record. What we have in the record is that it was for his GERD, which he does have. It was for his acid reflux. And the outcome of that was a prescription to treat acid reflux. So I would say yes. There's an allegation that he suffered from jaundice. Is that chronic? Or I didn't see it in the records that I looked at. So has that been episodic? Your Honor, I don't have the particulars on that. The jaundice medical records are cited in both our opening and reply brief. And if you give me a moment, I'd be happy to look for those record citations. I just wondered if that is something that he lives with, or is that just occasional? As far as we understand, I couldn't tell you truthfully one way or the other right now. Okay. That's all right. But there is chronic abdominal pain, fatigue, other symptoms of EPSI. And, again, I have to emphasize that we are at the F3 scale. This is very serious. I heard before in some of the comments that we were talking about Mr. Van Wagner, whether this was a serious condition, whether it has advanced. It has advanced. Do you have any explanation for the fact that the FIB 4 is so much lower? I mean, the range on that, and I don't know what any of this means, of course, but the range is less than 1.45 and greater than 3-point-something. And he was a .86. And where they recommend people for further evaluation is 2.5, which is sort of in the middle. So he's way, way below that. So that's a weird anomaly. It is. And the reality is, though, this is exactly why this is a fact issue. This is why it has to go to the jury. This is why medical professionals disagree about things. But also when you have the FIB 4 score, which is .86, that is but one measure. There is another, which is the fibro test, which shows severe fibrosis to cirrhosis. We have medical professionals that are saying we should go get treatment. FIB 4 is cirrhosis. FIB 3 is not necessarily. But I take your point that it was listed as advanced cirrhosis by Dr. Castillo. Castillo, yes. So that advancement. Does he have a descended abdomen? His abdomen is descended, and there is pain, yes. So the other thing I would like to flag is that there cannot be a debate, as I was saying, that this is a serious disease. I would also, Judge Wilson, you asked me before other cases to look at. This is, again, the Fourth Circuit, but directly on point. We're talking about hepatitis C in conditions where the F3 levels were experienced by the inmate. This is Gordon v. Schilling at 937 F3, 348. I got so wrapped up, I realized my time is out. I would just add, finally, on the appointment of counsel, to the extent that there was no abuse of discretion, which we believe there was, there is precedent for at least the court going back to the extent this goes to a trial and asking the district court to reconsider that with this kind of record and the complexities that counsel should be appointed, as he has not had counsel up until this date. Thank you, counsel. Thank you very much. I assume you're court-appointed or you're volunteer. Okay, thank you. The court will take a brief recess.